Anthony V. Rippa (Utah Bar No. 09594)
5095 Glendon Street
Murray UT 84123
Phone: (385) 775-8745
rippalaw@gmail.com

*Counsel for Defendant Samuel B. Parker*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

351 S. W. Temple, Salt Lake City, Utah 84101

| | |
|---|---|
| ALEXIS WILKINS,<br>     Plaintiff, | **REPLY IN SUPPORT OF MOTION TO DISMISS** |
| v. | Case No. 2:25-CV-00987-RJS |
| SAMUEL B. PARKER, | District Judge: Hon. Robert J. Shelby |
|      Defendant. | Magistrate: Cecilia M. Romero |

COMES NOW Defendant, by and through counsel, for the purpose of replying to Plaintiff's opposition to his motion to dismiss.

The case law has been sufficiently briefed in Defendant's motion and in Plaintiff's opposition. It will be referenced again only insofar as it applies to arguments raised in Plaintiff's opposition and Defendant's rebuttal. The jurisdictional inquiry is fact intensive and pivots on whether the facts demonstrate the required minimum contacts between Defendant and Utah to permit Utah to exercise personal jurisdiction over Defendant.

### I. PLAINTIFF'S ARGUMENT

To support her argument that Defendant has minimum contacts with Utah via the use of his @SamParkerSenate X account (the account at which he reposted the alleged defamatory tweet) Plaintiff asserts that Defendant has "cultivated, maintained and exploited a . . . Utah

audience for years, including throughout the period in which he published the defamatory statements at issue,"[1] that "since at least 2018 [he] has attempted to profit from the people of Utah,"[2] that he has "purposefully availed himself of Utah's protections,"[3] that he has "developed a devoted core audience in Utah,"[4] that he posts "in an attempt to collect donations from that audience,"[5] that he "continues to use his @SamParkerSenate account" which he opened back "in February 201[8]" "to target the audience that he cultivated in Utah during his Senate run,"[6] and that "much of the content . . . that [he] posts on his @SamParkerSenate account relates to Utah and Utah issues."[7]

## II. DEFENDANT'S REBUTTAL

Plaintiff does not proffer sufficient facts to support the above conclusory statements. She cherry-picks a few Utah-related tweets from 2025,[8] out of the thousands of tweets a cursory review (using the link provided in her opposition brief at Pg. 1 fn. 1)[9] shows that Defendant has posted since 2018, the majority of which do not relate to Utah. She also does not state sufficient facts to support her argument that Defendant has profited from people in Utah using his X account, that he continued to cultivate and exploit these people in 2025 when the alleged defamatory tweet was posted, or that he has a core audience in Utah.

Review of the @SamParkerSenate account (using the above-referenced link) shows that it has "171.6K" followers. Clicking "followers" takes one to a list of "followers" and "verified followers." Going down those lists and clicking "joined" takes one to the followers' "about"

---

[1] *See* Plaintiff's Opposition to Defendant's Motion to Dismiss at Pg. 4.
[2] *Id*. at Pg. 1.
[3] *Id.*
[4] *Id.* at Pg. 9.
[5] *Id.* at Pg. 11.
[6] *Id*. at Pg. 1
[7] *Id.*
[8] *Id.* at Pg. 2-3, 9-10.
[9] Sam Parker (@SamParkerSenate) X, https://x.com/SamParkerSenate.

page and shows where the "account" is "based in."   Spending some time doing this shows that the majority of Defendants' followers are located in "North America" and in other countries e.g. Bangladesh, Ghana, to name a few.  There is no "devoted core audience in Utah."

Scrolling down the feed on the homepage reveals multiple tweets about subjects that are unrelated to Utah.  The majority of them are about US-Israel relations and the America First movement.  There are posts about Israel-critic Norman Finkelstein, Israeli prime minister Benjamin Netanyahu, Charlie Kirk, Philip Zelikow, Bernard Baruch, uncensored AI, and other subjects unrelated to Utah.  Contrary to what Plaintiff asserts, "[m]uch of the content . . . that [he] posts" does not "directly address[] Utah and Utah issues."

Clicking comments and views does not show that his tweets are necessarily viewed by people in Utah.  The label "100% Utahn" on Defendant's profile does not automatically turn all of Defendant's tweets into Utah-related tweets, or his national and global audience into a "core audience in Utah."  By posting about national and international issues, Defendant cultivated a national and international audience, some of which may be in Utah, but most of which is not.

Defendant opened the X account in 2018 (eight years ago) in connection with his failed 2018 Utah senate bid, and continued to use it (including after he moved away from Utah) to post about national and international issues, and conservative politics.  This is not, contrary to what Plaintiff asserts, "maintain[ing] a . . . Utah audience for years, including throughout the period in which he published the defamatory statements."

Regarding the subject tweet of February 23, 2025 (following the link on Pg. 3 fn. 8 of Plaintiff's opposition)[10], it has only "5,555" and three comments.  Clicking on those views and comments does not evidence that the tweet was viewed or commented on by people in Utah as

---

[10] Sam Parker (@SamParkerSenate) X (Feb. 23, 2025, 11:17 PM)
https://x.com/SamParkerSenate/status/1893877974350377235.

opposed to anywhere else.  The account from which the tweet was reposted - @BasedSamParker (with "138K" followers) - has no connection with Utah.  The same tweet there has "1.3M" views, which is substantially higher.[11]  Defendant posted the tweet from both accounts to reach a large and varied audience, because both of the accounts have a large number of followers in North America, and globally.  In fact, the majority of Defendant's tweets about Plaintiff are on his @BasedSamParker account.[12]

### III. DEFENDANT'S DECLARATION IN SUPPORT OF MOTION TO DISMISS

Defendant asserts - in his *Second Declaration in Support of Motion to Dismiss* (attached hereto as Exhibit # 2) - that while he opened the @SamParkerSenate account in 2018 to promote his Utah senate campaign, he did not use it continuously after then to post about Utah issues, or to a Utah audience.  He had only a few hundred followers when the senate bid was finished.  After that he used the account to tweet about issues not necessarily having anything to do with Utah.  He "pivoted to being a regular person and tweeting to the world" while maintaining the account and the "Utahn" title, but nothing more connected him to Utah other than occasional and intermittent tweets about Utah and Mormon/LDS issues.

By January 21, 2025, he had amassed "105.4k" followers, about "105.3k" of those after his senate campaign.  He estimates that only a small fraction of his followers (of about "171.6K" followers) are or were based in Utah, mostly originating from his senate bid in 2018.  Regarding revenue earned, Defendant asserts he is unable to "identify a single dollar earned from [his] tweeting that came from Utah, or [that] was motivated or donated by virtue of the fact that [his] profile page says 'Utahn.'"  His designation of himself as "100% Utahn" is one of self-identity and not a description of his geographic location or audience.  Defendant's account experienced

---

[11] *See* Complaint at ¶ 11.
[12] *Id.* at Pg. 5-7, 9-15.

substantial growth following the "worldwide viral #BanTheADL" in 2023, at which time he had only "24k followers." He was one of the top "tweeters" on that subject, with a national and global audience."

By October 2023 his account had grown to "30.2k followers" based on his content regarding the ADL. Significant growth followed the October 7, 2023, attacks by Hamas. After that he posted mostly about US-Israel relations, the America First movement, and national and conservative topics, to a national and international audience. The alleged defamatory tweet – on both accounts – would have been viewed by this audience, and no more by Utahns than people anywhere else. Defendant rarely posts about Utah because most of his followers are not in Utah.

### IV. APPLICATION OF THE LAW

The case law cited and briefed in Defendant's motion, and in Plaintiff's opposition, may be summarized as follows: first, Defendant's contacts with Utah must be such that he should reasonably anticipate being haled into court here (he must have minimum contacts); and second, the exercise of jurisdiction must not offend traditional notions of fair play and substantial justice.

Regarding minimum contacts Plaintiff correctly states that Defendant must have "purposefully directed" his activities at Utah, and that in the context of interactive internet posts such as those on X this requires "something more" than in traditional cases i.e., that Defendant must have directed his activities at Utah in a "substantial way."[13]

Among the legal tests (and the respective case law) that Plaintiff cites to support her argument for minimum contacts are the following: a defendant's deliberate and repeated contacts with the forum state; the defendant's exploitation of a market in the forum state; and harmful

---

[13] The legal landscape regarding jurisdiction in the internet age, and particularly in the context of social media posts, is nothing but fractured with apparent circuit splits and seeming contradictory tests, or tests that seem to say more or less the same thing albeit using different terminology that often borders on jargon.

effects felt in the forum state. The latter test requires that Defendant's activities be intentional and expressly aimed at the forum state, and that the "brunt of the injury" be felt in the forum state.

The facts proffered by Plaintiff do not satisfy these tests. For the reasons stated above in Defendant's rebuttal, and in his declaration, it cannot be said that he purposefully directed the tweet, or the majority of tweets (using either account) at Utah. The majority of the tweets posted on @SamParkerSenate after 2018 did not concern Utah and were not posted to, viewed by, or commented on by, a core Utah audience. Posting only occasionally about Utah is not tantamount to Defendant directing other posts on the same account to anyone in Utah in a "substantial way."

One of the main cases cited by Plaintiff to support jurisdiction is *Systems Designs, Inc. v. New Customware Co., Inc.* The court held that "the inquiry revolves around a determination of whether or not the defendant purposefully directed its activities in a substantial way toward the forum state."[14] The case did not involve comments on X or other social media platforms. It was about an alleged trademark violation in the context of an interactive website. The court held that,

> Far from avoiding connections with Utah, however, [the defendant's] own actions in offering registration and design of training classes through their website, then including a list of major clients with Utah connections, demonstrates they purposefully directed their conduct toward Utah. Taken in combination with the alleged trademark infringement the website thus provides an additional basis for jurisdiction.[15]

Plaintiff describes this as the defendant (in the *System Designs* case) "target[ing] clients in Utah by tailoring its services to potential Utah clients."

In the instant case Defendant reposted the tweet on an account he set up eight years ago related to his senate bid. The tweet did not concern anyone in Utah, or a Utah-specific issue.

---

[14] 248 F. Supp. 2d 1093, 1100 (D. Utah 2003).
[15] *Id.* at 1102-11013. The other basis for the court finding jurisdiction was that the effects of an infringement of a nationally registered trademark could be felt in Utah. *Id.* at 1100.

Merely reposting the tweet is not "purposefully direct[ing] [his] activities in a *substantial* way toward [Utah]."[16] (Emphasis Added).  Unlike the defendant in *System Designs* Defendant does not "offer[]" services to viewers or followers of the @SamParkerSenate account.  He does not "tailor[] [his] services" to viewers or followers of the account.  The case is therefore inapposite.

Plaintiff's argument that Defendant "cultivated, maintained and exploited" a Utah audience for years, including through the period he posted the comments about Plaintiff on X, are likewise not supported.  Defendant opened the X account in 2018.  Since then it has grown to approximately 170,000 followers, most of whom are not in Utah.  His other account has a following of approximately 130,000.  Other than alleging he reposted tweets from one account to the other, Plaintiff does not say how Defendant has "cultivated, maintained and exploited" a Utah audience "throughout the period in which he published the defamatory statements."  Mere reposting to an audience that already existed, most of whom are not based in Utah, is not the "something more" the court found to support jurisdiction in *System Designs*.

The other cases cited by Plaintiff are likewise distinguishable. [17]  They require (1) continuous and deliberate exploitation of the forum state's market or (2) an intentional express aiming of the tortious conduct at the forum state and an effect - called the "brunt of the injury" – felt in the forum state (requiring a finding that the defendant intended the harm to occur primarily and particularly in the forum state).

In regard to continuous and deliberate exploitation of the forum state's market, Plaintiff asserts that Defendant "maintains active donation links for people supporting his social media posts," with a citation, not to any purported donation link at the @SamParkerSenate account, but

---

[16] *Id.* at 1100.

[17] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), *Calder v. Jones*, 465 U.S. 783 (1984) and *Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895 (10th Cir. 2017).

to another unsupported allegation in their own complaint at paragraph 10.  Defendant previously maintained links for the purpose of supporting his senate bid, and like many X users maintains those links to generate income from content.  However, for the reasons stated above, Defendant does not have a large core Utah audience to whom he has been tweeting, and the audience he previously tweeted to in 2018 during his senate bid was small, numbering a few hundred.

As stated by Plaintiff, "the requirement of purposeful availment ensures that the defendant will not be haled into a jurisdiction as a result of random, fortuitous, or attenuated contacts."  For reasons stated above, Defendant's contacts with a small Utah audience among the 170,000 followers of his @SamParkerSenate account since his campaign of 2018 are at least attenuated.  Also, the brunt of the injury was not felt in Utah.  The @SamParkerSenate post only got 5,555 views (and those were not all from viewers in Utah) whereas the @BasedSamParker post got 1.3 million views.  The brunt of the injury (if any) would be felt nationally and internationally.  The brunt of the injury was therefore not in Utah.

The above contacts are not sufficient for Defendant to expect that he could be haled into court in Utah over a tweet that was posted on an account which rarely discusses Utah issues and which does not speak primarily to a core Utah audience.

Finally, while Plaintiff correctly states that pre-trial discovery may be conducted remotely, the trial of this matter requires in-person testimony necessitating travel from out of state by all of the parties, and is likely to last a while.  It would be inconvenient for Defendant to leave his home in Washington, where he cares for his ailing parents, and with his limited funds, to travel to Utah for an indeterminate time for the purpose of attending trial.

Plaintiff on the other hand will have to travel regardless, since she is in Tennessee.  It thus presents no greater burden on Plaintiff to have to litigate in and travel to Washington instead of

Utah, unless she is forum shopping to avoid application of Washington's version of the anti-SLAPP statute.[18] The fact that Plaintiff used up a good amount of her opposition brief arguing for discovery on the issue also appears to be a concession that she does not have enough evidence to support minimum contacts and the exercise of jurisdiction in Utah.

## V. CONCLUSION

Plaintiff rests her minimum contacts argument on Defendant having reposted the tweet on a separate X account that he opened in 2018 related to his Utah senate campaign. In 2018 the account only had a few hundred followers. Since then it has grown to about 170,000 followers most of whom are located in North America and globally, based largely on Defendant's tweets about national, international, and conservative issues. Very few tweets (compared to the majority of them) since 2018 have discussed Utah or Utah issues. Defendant's audience is national and global. Thus he did not purposefully direct his activities at Utah in a substantial way such that he should anticipate being haled into court here.

For the foregoing reasons the Court should grant the motion and dismiss Plaintiff's complaint.

DATED this 8th day of June 2026.

/s/ *Anthony V. Rippa*
Anthony V. Rippa
*Counsel for Defendant Samuel B. Parker.*

---

[18] The statute allows defendants to seek early dismissal of meritless lawsuits that challenge the exercise of their First Amendment rights.

Anthony V. Rippa (Utah Bar No. 09594)
5095 Glendon Street
Murray UT 84123
Phone: (385) 775-8745
rippalaw@gmail.com

*Counsel for Defendant Samuel B. Parker*

---

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

351 S. W. Temple, Salt Lake City, Utah 84101

---

| | |
|---|---|
| ALEXIS WILKINS, | **EXHIBIT 2** : **SECOND DECLARATION OF SAMUEL PARKER** |
| Plaintiff | Case No. 2:25-CV-00987-RJS |
| v. | District Judge: Hon. Robert J. Shelby |
| SAMUEL B. PARKER, | Magistrate: Cecilia M. Romero |
| Defendant. | |

---

1.  I, Samuel B. Parker, state the following under penalty of perjury.

2.  I am above the age of majority and competent to make this declaration.

3.  I know the facts declared herein to be true of my own personal knowledge and belief.

4.  I opened the @SamParkerSenate X account in 2018 to promote my Utah senate campaign.

5.  I did not continuously use that account after the campaign to post exclusively about Utah issues, or to a Utah audience. Of my Utah-related tweets, many of them were to educate people outside of Utah about what was happening in Utah.

6.  At the time my senate run concluded, over 8 years ago, I had less than 200 followers of that account.

7. After the senate bid, I continued to tweet about random issues using that account, not necessarily having anything to do with Utah. I pivoted to being a regular person and tweeting to the world while maintaining the account and the "Utahn" title, with some occasional tweets about Utah and Mormon/LDS issues.

8. By January 21, 2025, I had amassed 105.4k followers, roughly 105.3k of which came after my senate campaign.

9. I estimate that only about 0.11% or fewer of the @SamParkerSenate account's ~171.6k followers ever followed me because they were in Utah and interested in my Utah senate campaign.

10. Some of the small audience I acquired during my 2018 campaign was not in Utah at all, since my campaign garnered some limited national attention, and those national followers were part of my total following of less than 200 followers.

11. Regarding revenue earned, I have been unable to identify a single dollar earned from my tweeting that came from Utah, or that was motivated or donated by virtue of the fact that my profile page says I am a "Utahn" (my profile page says I am from the future, but that does not mean I am from the future, or that I target tweets at people in the future).

12. My designation of myself as "100% Utahn" was and is one of self-identity and not a description of my geographic location or of my target audience.

13. The X account experienced substantial growth following the worldwide viral #BanTheADL movement in 2023, at which time I had only 24k followers. I was one of the top tweeters on that subject, reaching a national and global audience.

14. By October 2023 my account had grown to 30.2k followers based on my content regarding the ADL.

15. Significant growth followed the October 7, 2023, Hamas attacks.  After that I posted mostly about US-Israeli relations, the America First movement, and national and conservative topics, to a national and international audience, growing from 30.2k followers to what is now more than 170k followers.

16. The tweet Ms. Wilkins complains about would have been viewed by this national and international audience, and not particularly by people in Utah any more than people elsewhere in the country, or in the world.

17. My accounts have become so disconnected from being identified with Utah that I frequently receive follower feedback expressing surprise at not knowing I am a member of the Church of Jesus Christ of Latter-day Saints aka the Mormon church (the church many Utahns go to, and that is associated with Utah).

18. Most of the commenters on the tweet thread Ms. Wilkins has complained about were Muslims and Indians since there was a typo in the first tweet that called Kash Patel a "Hindu Muslim," and most of the comments discussed or objected to this incorrect label.

19. Because the audience and followers of both my X accounts are mostly outside Utah, I rarely tweet about Utah or Utah-related issues except when there is something that I think my national and/or international audience might find interesting or relevant.

20. One recent exception to this rarity of tweeting about Utah occurred over the last nine months regarding the assassination of Charlie Kirk. Since it happened in Utah, it sometimes necessitates mentioning Utah. However, the assassination has captured national and international attention, so these Utah-referencing tweets are meant for and read by whoever is interested in the topic.

21. I declare under penalty of perjury of the laws of the United States of America that the

foregoing is true and correct.[19]

EXECUTED on this 7th day of June 2026.

/s/ *Samuel B. Parker*
Samuel B. Parker

*Signed with permission of, and e-signature authorized via email by, Samuel B. Parker on June 7, 2026.*

---

[19] "That statute [28 USC § 1746] authorizes parties to submit unsworn declarations in lieu of affidavits provided that the declarations state that they are 'true and correct' and are made 'under the penalty of perjury.'" *Vazirqbqdi v. Denver Health and Hospital Authority*, 782 Fed. Appx. 681, 687 (10th Cir. 2019).

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June 2026, the foregoing REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT and attached EXHIBIT 2:SECOND DECLARATION OF SAMUAL PARKER was filed electronically via the District of Utah ECF system, is available for viewing and downloading, and will be sent electronically to the counsel who are registered participants identified on the Notice of Electronic Filing, and was sent to the following via electronic mail:

Ammon Clemens Esq.
133 West Northwood Lane, Ste. 203
Provo UT 84604
ammon.clemens@gmail.com

*Counsel for Plaintiff Alexis Wilkins*

/s/ *Anthony Rippa*
Anthony Rippa
*Counsel for Defendant Samuel B. Parker*